IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INVISTA S.à r.l. and INVISTA (Canada) Company, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 07-119 (GMS) ) |
| FIBER RESOURCES INTERNATIONAL, INC., | ) ) ) |
| Defendant. | ) ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE**

Plaintiffs INVISTA S.à r.l. and INVISTA (Canada) Company (collectively "INVISTA" or "Plaintiffs") hereby submit this opposition to Defendant Fiber Resources International, Inc.'s ("FRI" or "Defendant") Motion to Transfer Venue. With its Motion, FRI seeks to transfer this action to the Northern District of Georgia despite expressly agreeing in writing to Delaware as the appropriate venue for any dispute between the parties. Indeed, FRI regularly and systematically transacted business with a Delaware corporation (DuPont) as part of the contractual relationship at issue. FRI cannot now claim that it has not transacted business in Delaware and therefore should not be subject to jurisdiction there. Undoubtedly then, FRI's Motion is offered simply as another delay tactic, designed to prevent INVISTA from expeditiously addressing its claims in the forum agreed to by the parties.

**FACTUAL BACKGROUND**

INVISTA, and its affiliate companies, is one of the world's largest providers of integrated fibers and polymers. Complaint (D.I. 1), ¶ 9. Amongst its other businesses, INVISTA sells waste fiber to customers for use in various products and for various applications, including

FRI. *Id.* Beginning at least as early as 2001, INVISTA (through its predecessor-in-interest DuPont)[1] began selling waste fiber to FRI through a series of individual purchase agreements. *Id.*

To initiate a purchase, FRI would contact INVISTA to inquire how much of a particular waste fiber was available for sale from INVISTA at any given time. *Id.*, ¶ 10. INVISTA would respond to FRI with the amount of the desired waste fiber that was available. *Id.* FRI would thereafter submit Purchase Orders to INVISTA identifying the type and volume of particular waste fiber it desired to purchase. *Id.* In response to FRI's Purchase Orders, INVISTA would, at times, issue Order Acknowledgements to FRI specifying the fiber type, quantity, sales price, and shipping information for the particular order. *Id.*, ¶ 11. The Order Acknowledgements also contained INVISTA's standard terms and conditions ("Terms and Conditions") that governed INVISTA's proposed sale of waste fiber to FRI. *Id.*; Complaint Exh. A. Upon shipment of waste fiber to FRI, INVISTA would issue an Invoice to FRI for the amount due from FRI for that shipment. *Id.*, ¶ 12. The Invoices also contained the same Terms and Conditions that governed INVISTA's sale of waste fiber to FRI. *Id.*; Complaint Exh. C.

Relevant to FRI's Motion, the Terms and Conditions contained explicit forum selection clauses specifying the Delaware as the applicable forum for any dispute relating to INVISTA's sale of fiber to FRI. Specifically, those Terms and Conditions provided as follows:

> **20. GOVERNING LAW/VENUE FOR DISPUTES.** The validity, performance, construction, and effect and all matters arising out of or relating to the Agreement shall be interpreted in accordance with the Laws of the State of New York, without regard to its conflicts of law rules. . . . Any action or proceeding between Buyer and INVISTA relating to the Agreement shall be commenced and maintained exclusively in the state or federal courts in

---

[1] DuPont Textiles, Inc., owned by E.I. DuPont de Nemours, was renamed INVISTA, Inc. in 2003. Thereafter, INVISTA, Inc. was purchased by Koch Industries, Inc. in 2004 and renamed INVISTA S.à r.l.

Wilmington, Delaware, and Buyer submits itself unconditionally and irrevocably
to the personal jurisdiction of such courts.

*See* Terms and Conditions, ¶ 20, Complaint Exhs. A and C. FRI never objected to the Terms and

Conditions proposed by INVISTA.

Up until 2006, FRI had paid INVISTA for the fiber it purchased. From April through

June 2006, FRI purchased waste fiber in the amount of $589,471.26 from INVISTA in a series of

transactions. Complaint, ¶ 13. FRI accepted the waste fiber shipped by INVISTA in connection

with each purchase transaction, and thereafter failed to pay INVISTA for the waste fiber that it

shipped to FRI from April through June 2006. Id., ¶¶ 14-15.

INVISTA filed this action on February 26, 2007 to recover the amount due on its unpaid

invoices. In response, FRI admitted that it purchased waste fiber in the amount of $589,471.26

from INVISTA and failed to pay for that fiber. Answer (D.I. 14), ¶¶ 13-15. However, to excuse

its failure to pay INVISTA, FRI also claimed that INVISTA breached the terms of an oral

agreement whereby INVISTA would only sell waste fiber to be used for a certain application (as

an additive to concrete mixes) to FRI. *Id.*, ¶¶ 24-25. According to FRI's principal, Art

Hamilton, this so-called "hand shake" agreement had no specific terms (duration, price, quantity,

or termination provision), only that INVISTA would not sell waste fiber for concrete

applications to anyone other than FRI. *See* Depo. of J. Hamilton, 71:19-72:19, 73:22-74:9,

83:16-85:22 (excerpts attached hereto as Exh. A). INVISTA denied that it entered into such an

agreement, and claimed that such an oral agreement was barred by the applicable Statute of

Frauds. Reply to Counterclaim, D.I. 6, pp. 1, 3.

**ARGUMENT**

FRI claims that it does not transact business in Delaware, and that it never agreed to litigate in the District of Delaware. As such, this case should be transferred to the forum of its choice, the Northern District of Georgia. In reality, FRI has routinely transacted business in Delaware, and its so-called "oral exclusive dealings agreement," which is the subject of its counterclaim, was allegedly entered into with a Delaware corporation. Moreover, the contracts which form the basis for this dispute all contained forum selection clauses establishing Delaware as the applicable forum for any disputes. While FRI may dispute that it ever read those documents, or agreed to be bound to the Terms and Conditions made part of them, it cannot dispute that it received the agreements, accepted INVISTA's shipments, and, until April 2006, paid INVISTA the money it was owed.

I.    **INVISTA's Choice of Forum – Delaware – Should Not be Disturbed.**

FRI seeks to deprive INVISTA of its choice of forum, claiming that venue in Delaware is either improper, under 28 U.S.C. § 1406, or inconvenient, under 28 U.S.C. § 1404. However, it has not demonstrated the exceptional circumstances necessary to dispute INVISTA's choice of Delaware for this dispute. First, the parties agreed in writing to Delaware as the forum for their dispute. Second, FRI has entered into contracts with Delaware corporations and has regularly transacted business in Delaware. As such, FRI cannot be heard to complain when it is required to litigate in Delaware.

A.    **Applicable Standards for FRI's Transfer Request.**

A transfer request pursuant to Section 1406 is appropriate when venue in the filed forum is improper. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d. Cir. 1995). However, venue

4

is proper in a district where the defendant transacts business and is otherwise subject to personal jurisdiction. *Id.* at 879 (citations omitted).

Under Section 1404, a moving party has the burden of establishing that a transfer would serve the convenience of the parties and witnesses and the interests of justice. *Id.* In ruling on such motions, courts consider a variety of private and public interest factors, including the plaintiff's choice of forum, the defendant's preference, the convenience of the parties and witnesses, the location of records, enforceability of a judgment, practical considerations of the court, the relative administrative difficulty in the two courts, the local interest, and the familiarity of the trial judge with the applicable law. *Id.* at 879-80 (citations omitted). "Within this framework, a forum selection clause is treated as a manifestation of the parties' preference as to a convenient forum." *Id.* at 880. Indeed, the parties' agreement as to the most proper forum is entitled to substantial consideration, although it should not receive dispositive weight. *Id.* (citations omitted). Where the forum selection clause is valid, which requires that there have been no "fraud, influence, or overweening bargaining power," the moving party bears the burden of demonstrating why it should not be bound by the contractual choice of forum. *Id.* (citation omitted). Indeed, " it is incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Bbdova, LLC v. Automotive Tech., Inc.*, 358 F. Supp. 2d 387, 390 (D.Del. 2005) (citations omitted).

**B.     The Parties Agreed to Litigate Their Claims in Delaware.**

As noted above, the governing contracts entered into by the parties unequivocally provide

5

for Delaware as the forum for any disputes.[2]  INVISTA, as the master of its offer, has wide

latitude over the terms of its offer, and may impose any terms or conditions of its choosing.  *See*

Restatement (2d) of Contracts, § 60; *Brill v. Burlington Northern, Inc.*, 590 F. Supp. 893, 898

(D.Del. 1984).  Furthermore, this Court has clearly stated that:

> a forum selection clause is *presumptively valid* and will be
> enforced by the forum unless the party objecting to its enforcement
> establishes (1) that it is the result of fraud or over-reaching, (2) that
> enforcement would violate a strong public policy of the forum, or
> (3) that enforcement would in particular circumstances of the case
> result in litigation in a jurisdiction so seriously inconvenient as to
> be unreasonable.

*McGurk v. Swisher Hygiene Franchise Corp.*, 2003 WL 252124, at *1 (citations omitted)

(emphasis added).  In its Motion and the accompanying Affidavit of Jack Arthur Hamilton, FRI

does nothing to overcome the presumption that the forum selection clause is valid and presents

no evidence that enforcement of the parties' forum selection clause would result in fraud or

overreaching, or that enforcement would violate some public policy or result in unreasonable

inconvenience.  Instead, FRI conveniently claims that it did not regularly receive those Terms

and Conditions as part of any documentation received from INVISTA, and that it did not agree

to be bound by those terms.  FRI Brief (D.I. 29), p. 3.  In reality, while FRI may not have read

the documents, it routinely received those Terms and Conditions from INVISTA, and never

objected to them.  Indeed, FRI admits that it received at least 3 invoices with the Terms and

Conditions included by no later than May 2006.  Affidavit of Jack Arthur Hamilton, D.I. 29, Ex.

A at ¶ 10.

---

[2] INVISTA revised the Terms and Conditions contained in its invoices during the course of the parties' relationship.  At all times, however, first DuPont's and then INVISTA's Terms and Conditions specifically required Delaware as the forum for any disputes.  Moreover, the last revision was made prior to 2006, so that all of the Order Acknowledgements and Invoices issues to FRI during 2006 (attached as Exhibits A and C to INVISTA's Complaint) contained the forum selection clause detailed above.

Specifically, FRI would receive from INVISTA invoices detailing the volume and price of product purchased with a particular order. Those invoices included INVISTA's standard Terms and Conditions, and specifically stated on their face that those Terms and Conditions were part of the sale. *See* Complaint Exhs. A and C. As part of its documentation process for its purchases from INVISTA, FRI would compile all of the documentation related to a particular purchase into a single file. *See* Depo. of L. Norris, 40:5-16, 42:16-44:6 (excerpts attached hereto as Exh. B). Literally dozens of copies of INVISTA's Terms and Conditions were contained in FRI's files produced as part of this litigation. Indeed, Art Hamilton, one of FRI's owners, and Laurie Norris, a FRI employee, both confirmed that FRI regularly received INVISTA invoices containing the Terms and Conditions during the course of FRI's business. Hamilton Depo. (Exh. A), 150:17-151:2, 208:10-209:9, Norris Depo. (Exh. B), 44:3-6, 56:11-58:21. Further, even though FRI claims that it never "agreed" to be bound by those terms, its conduct demonstrates otherwise. By accepting INVISTA's goods, without objection or complaint to the governing terms of sale, FRI is now bound by those terms, including the forum selection clause.

**C.     FRI Transacts Business in Delaware.**

FRI also argues that Delaware has not valid connection to this dispute, and that it does not transact business in Delaware. FRI Brief, p. 2. Again, FRI misstates the facts. Not only did FRI agree to litigate in Delaware, it routinely transacted business in Delaware.

Specifically, beginning in 2001, FRI contracted with, and purchased concrete fiber, from DuPont Textiles, prior to the formation of INVISTA and its acquisition by Koch Industries. Hamilton Depo. (Exh. A), 42:10-13. FRI knew that DuPont Textiles was headquartered in Wilmington, Delaware, and even received invoices from DuPont identifying its Delaware office location. Following INVISTA's formation, FRI continued to receive invoices identifying

7

INVISTA as a company headquartered in Delaware. *Id.*, 205:13-25. It was only after Koch Industries purchased INVISTA in 2004 that the governing invoices identified a different address. *Id.*, 208:16-209:9.

As part of its business dealings with DuPont, Mr. Hamilton even traveled to Wilmington to meet with a DuPont employee. *Id.*, 145:10-146:6. Thereafter, even though INVISTA moved its headquarters to Kansas (following the acquisition), FRI continued to do business in Delaware. As late as 2006, FRI was doing business with Kenco, Inc., a company located in Seaford, Delaware. Norris Depo. (Exh. B), 34:25-37:2. Specifically, certain shipments of INVISTA fiber were made available to FRI at a Kenco facility in Seaford, and FRI would have to communicate with Kenco in order to arrange for the shipments to be picked up. *Id.* When FRI transacts business in Delaware, and even sends an employee there as part of that relationship, it is "axiomatic" that FRI "purposefully availed itself of the privilege of conducting activities in the state, . . . and thus "could reasonably anticipate being haled into Court in Delaware." *Speakman Co. v. Harper Buffing Machine Co., Inc.*, 583 F. Supp. 283, 275 (D.Del. 1984) (citations omitted).

Finally, as part of its counterclaims in this case, FRI seeks to enforce an alleged oral agreement entered in 2001 between Mr. Hamilton and Andy Howell, an INVISTA employee. At the time the alleged agreement was reached, Mr. Howell as employed by DuPont Textiles, a Delaware corporation. As such, FRI is seeking to enforce an alleged contract entered into with a Delaware company, and should not surprised when it must do so in Delaware.

## II.    FRI's Motion to Transfer is Merely Offered as a Delay Tactic to Impede INVISTA's Ability to Pursue its Claims.

INVISTA also submits that FRI's Motion is simply another example of FRI's delay tactics in this case. At every turn, FRI has failed to timely meet its obligations. FRI failed to

8

timely serve its Rule 26 Initial Disclosures, due on October 19, 2007, and only did so on November 29, 2007 after receiving a demand from INVISTA. *See* Letter from Robert L. Lee (Attached as Exh. C). FRI changed counsel in December 2007, necessitating a postponement of the then scheduled mediation. It failed to timely respond to INVISTA's interrogatory and document requests, served on December 4, 2007, and again only did so on January 21, 2008 after receiving a demand from INVISTA. *See* Letter from Kelly E. Farnan (Attached as Exh. D). Thereafter, FRI claimed that it could not be available for depositions prior to the scheduled close of discovery on January 18, 2008, forcing INVISTA into agreeing to a stipulated two week extension to complete its timely noticed depositions.

Pursuant to the stipulated extension, fact discovery is set to close today and case dispositive motions are due to be filed on February 15, 2008. D.I. 31. Accordingly, the only events left in this case are case dispositive motions and trial. FRI's Motion is a clear attempt to delay entry of a judgment in this Court against it and INVISTA would be unduly prejudiced if the case were transferred at this stage.

Finally, with regard to the instant motion, counsel for FRI first mentioned the possibility of seeking an alternate venue for this case during the Court's Scheduling Conference held on September 28, 2007. During the conference, counsel for FRI was instructed to confer with counsel for INVISTA to exchange positions to determine whether a motion challenging jurisdiction and venue was appropriate. *See* Trans. From September 28, 2007 Conference (Attached as Exh. E) at p. 5.[3] Not only did FRI not timely file the instant motion following the

---

[3] Indeed, FRI's Motion did not contain the certificate contemplated by Local Rule 7.1.1 and should be denied on that basis alone.

Court's conference, but FRI also failed to even address the issue with counsel for INVISTA prior to filing the instant motion.[4]

## CONCLUSION

For the reasons set forth above, INVISTA respectfully requests that FRI's Motion to Transfer Venue be denied.


*Kelly E Farnan*
_____
Jeffrey L. Moyer (#3309)
moyer@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
*Attorneys for Plaintiffs INVISTA S.à.r.l. and*
*INVISTA (Canada) Company*

OF COUNSEL:

Robert L. Lee
Rebecca B. Crawford
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000


Dated: February 1, 2008

---

[4] Of note, while FRI claims it has not transacted business in Delaware, and Delaware has not connection to this dispute, FRI has not moved to dismiss INVISTA's claims for lack of personal jurisdiction pursuant to F.R.C.P. 12(b)(2).

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 1, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF and caused the same to be served on the defendant at the address and in the manner indicated below:

## BY HAND DELIVERY

David L. Finger
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155

I hereby certify that on February 1, 2008, the foregoing document was sent to the following non-registered participants in the manner indicated:

## BY FIRST-CLASS U.S. MAIL

W. Winston Briggs
Decker, Hallman, Barber & Briggs
17th Floor
260 Peachtree Street
Atlanta, GA 30303

Kelly E. Farnan  (#4395)

# EXHIBIT A

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.        January 28, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


INVISTA S.à r.l. and INVISTA    )
(Canada) Company,               )
                                )
            Plaintiffs,          )
                                )
        vs.                      )   CIVIL ACTION
                                )     FILE NO.:
                                )   07-119 (GMS)
FIBER RESOURCES INTERNATIONAL,  )
INC.,                           )
                                )
            Defendant.           )

                - - -


        Deposition of JACK A. HAMILTON, JR.,

    taken on behalf of the Plaintiffs, pursuant to

    the stipulations agreed to herein, before

    Steve S. Huseby, Registered Professional

    Reporter and Notary Public, at Decker,

    Hallman, Barber & Briggs, 17th Floor, 260

    Peachtree Street, Atlanta, Georgia, on the

    28th day of January, 2008, commencing at the

    hour of 9:12 a.m.

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.    January 28, 2008

Page 42

1    concrete fiber or was it fiber for some other

2    application?

3         A.    Fiber for another application.

4         Q.    What kind of fiber was that?

5         A.    I think it was gang wound yarn.

6         Q.    What is gang wound yarn used for?

7         A.    Mainly chopping, cutting short.

8         Q.    What does it go into?

9         A.    Wet laid nonwovens.

10        Q.    Do you recall about what year FRI

11   began purchasing concrete fiber for and from

12   DuPont?

13        A.    It was late 2001, early 2002.

14        Q.    Prior to that time, in the beginning,

15   I guess in the 1996, 1997 timeframe, did FRI

16   purchase other types of fiber from DuPont

17   other than this gang wound yarn?

18        A.    We might have purchased some, you

19   know, high tenacity yarn, but I don't remember

20   the time -- the timeframe.

21        Q.    Beginning in I guess late 2001 when

22   FRI first purchased concrete fiber from DuPont

23   through the time period of I guess May of 2006

24   when FRI stopped buying concrete fiber from

25   Invista could you estimate the percentage of

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.          January 28, 2008

Page 71

1    never really changed for the end product.

2         Q.    Okay.  So the raw material itself

3    would come in, in effect, different shapes and

4    sizes?

5         A.    That -- I guess.  Yeah, I guess that's

6    a good way to term it.  I don't --

7         Q.    But it would still be processed down

8    in general to the same finished product?

9         A.    Yes.

10        Q.    Did the size of the finished product

11   ever change?  I think we talked about a range

12   of 6 to 38.

13        A.    I mean, yes, it would change, I mean,

14   you know, occasionally.

15        Q.    Did some customers prefer different

16   sizes?

17        A.    Yeah; I mean, they ordered different

18   sizes.

19        Q.    Did you ever have discussions with Mr.

20   Howell about exclusivity?

21        A.    Absolutely.

22        Q.    On how many occasions did you have

23   those discussions with Mr. Howell?

24        A.    I don't know how many, but several.

25        Q.    Were they over any particular

Page 72

1    timeframe for those conversations?

2        A.    When he initially approached me about

3    the market, I said, if I go out and develop

4    this, I want to be protected in that market.

5        Q.    What did he -- how did he respond?

6        A.    He told me he would protect me in that

7    market.

8        Q.    What did you have an understanding

9    that that meant from him?

10       A.    That he would not sell to anybody else

11   or compete with me in any way in that market.

12       Q.    How many times did you have that

13   conversation with Mr. Howell?

14       A.    I don't know.  I mean --

15       Q.    Did you ever ask Mr. Howell to put

16   that in writing?

17       A.    I did.

18       Q.    Did he?

19       A.    He wouldn't.

20       Q.    Why not?

21       A.    He said that dealing with these large

22   companies like Invista and DuPont, it would

23   take a year to get it done due to the lawyers

24   and the legalities and that I had his word

25   that he would protect me.

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
                   Jack A. Hamilton, Jr.          January 28, 2008

1       Q.    Did he tell you that he could not put

2    it in writing?

3       A.    No.

4       Q.    Did he tell you that Invista or DuPont

5    would not approve of such a relationship?

6       A.    No.

7       Q.    I think you testified earlier in

8    effect that FRI bought all the concrete fiber

9    that Invista could supply.

10      A.    Yes.

11      Q.    In effect, your demand from your

12   customers exceeded the supply you could have,

13   is that a fair characterization?

14      A.    That's a fair characterization.

15      Q.    How did you explain to your customers

16   whose orders you couldn't fulfill or whose

17   demands you could not meet?

18      A.    I mean, I tried to keep a safety stock

19   of inventory.  I mean, we basically had a

20   truck waiting every time they had a truckload

21   ready.

22      Q.    Now, when you and Mr. Howell came to

23   this understanding on exclusivity, were there

24   any other terms or conditions of the

25   arrangement other than the fact I think in

Page 74

1    your words that you would be protected in the

2    market?

3        A.   Basically, I would be protected in the

4    market if I went out and developed it, and if

5    it ever changed, he would sit down and we

6    would discuss it.

7        Q.   How long was this exclusive

8    relationship supposed to last?

9        A.   We did not put a time limit on it.

10       Q.   And I understand we talked earlier the

11   price varied over time.  Do you recall ever an

12   instance where Invista had a supply of

13   concrete fiber that Fiber Resources did not

14   purchase or an offer was made that Fiber

15   Resources did not take?

16       A.   On concrete fiber?

17       Q.   Yes, sir.

18       A.   Not to my knowledge.

19       Q.   Was there a price point at which Fiber

20   Resources would not have taken a shipment from

21   Invista?

22       A.   I mean, you have to be market

23   competitive.  I mean, that's an understanding

24   of any business.

25       Q.   Did Andy Howell ever tell you that he

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.          January 28, 2008

Page 83

1    recall.

2        Q.    Okay.  Do you have any idea what that

3    final price was per pound?

4        A.    I mean, it was probably somewhere

5    between a dollar and a dollar ten.

6        Q.    Did you have any understanding why the

7    price went up, more than doubled in the span

8    of five or so years?

9        A.    The whole nylon -- all petrol chemical

10   based polymers and products have gone up

11   substantially.  Look at your gas pump.

12       Can I make a quick bathroom run?

13       Q.    Yes.

14            (Brief recess).

15   BY MR. LEE:

16       Q.    When you were talking to Mr. Howell

17   about the terms and conditions under which

18   Invista would supply and FRI would purchase

19   concrete fiber, including some of these

20   conversations about exclusivity, did you all

21   talk about any sort of price caps or

22   guaranteed profit margin for FRI on the

23   product?

24       A.    No.

25       Q.    Did you talk about any sort of

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.        January 28, 2008

Page 84

1    limitations on the types of customers that FRI

2    could sell the product to?

3        A.    I mean, what do you mean by -- I

4    mean --

5        Q.    Well, I guess my point is this.   I

6    understand you testified earlier this was off

7    grade or B grade product, and you mentioned a

8    concern that Invista may have had maybe with

9    some other application that they not

10   cannibalize their first run product.

11       A.    Uh-huh.

12       Q.    Were there any sort of discussions

13   like that with regard to concrete fiber?

14       A.    No, no, no.

15       Q.    Were there any limitations at all

16   placed by Andy on to whom or the conditions

17   under which FRI could sell this concrete

18   fiber?

19       A.    No.

20       Q.    You said that Andy promised that

21   Invista would not sell to anyone other than

22   FRI.

23       A.    Yes.

24       Q.    Did he make any other promises or

25   representations about the relationship or the

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.          January 28, 2008

Page 85

1    agreement?

2        A.   No.  I mean --

3        Q.   What would have happened if Invista

4    was unable to make -- or unable to supply

5    concrete fiber at all?

6        A.   I mean, you know, they would have quit

7    selling it to me.

8        Q.   What would have happened if FRI

9    reached a position with its customers that it

10   could no longer -- that the supply that

11   Invista had available exceeded FRI's demand

12   for its product?

13       A.   I mean, that never happened, but we

14   would have -- I mean, we would have worked

15   harder to develop more business, but it never

16   happened.

17       Q.   Did you or Andy ever discuss the

18   circumstances under which FRI or Invista could

19   walk away from its relationship in concrete

20   fiber?

21       A.   We just said if things changed, we

22   would sit down and discuss it.

23       Q.   Was there the possibility that FRI

24   could find another supplier for nylon, raw

25   material for concrete fiber other than

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.          January 28, 2008

Page 145

1    where was he physically located?

2        A.    I think he lived and worked out of his

3    house in the Charlotte, North Carolina area,

4    but I'm not 100 percent sure.

5        Q.    At the time DuPont was headquartered

6    in Wilmington Delaware, is that correct, to

7    your knowledge?

8        A.    To my knowledge, their parent company

9    was, yes.

10       Q.    Did you ever go to Wilmington,

11   Delaware in connection with the DuPont

12   business?

13       A.    I went at one point when I was

14   traveling through Philadelphia.  I met with

15   the lady that was credit, but I think that was

16   when it was still DuPont.

17       Q.    You said the lady that was credit.

18   Was there someone in the accounting department

19   or credit department?

20       A.    Yes.

21       Q.    And she was with DuPont in Wilmington?

22       A.    Yes.

23       Q.    Do you remember her name?

24       A.    I think it was like Kathy Murdock

25   or -- the first name is Kathy.

Page 146

1        Q.   Is it Kathy McCormick?

2        A.   McCormick, that's it.

3        Q.   Do you recall about what timeframe

4    that was?

5        A.   2000, 2001, I'm guessing.  I don't

6    really remember exactly.

7        Q.   Now, there was a time period when FRI

8    would send its financials to Ms. McCormick at

9    DuPont or Invista, do you recall that?

10       A.   I don't recall.  I mean, I'm just

11   trying to sit here and think.  I don't recall.

12       Q.   I've got some documents I'll show you.

13   I'm just curious what the process was.  But

14   I'll show you those later.

15       Now, after DuPont I guess became Invista

16   before it was sold to Koch Industries, did you

17   ever have occasion to visit its Wilmington

18   headquarters?

19       A.   No.

20       Q.   Mr. Short was in Charlotte.  Andy

21   Howell is in Chattanooga, correct?

22       A.   Correct.

23       Q.   At some point, of course, Invista was

24   purchased by Koch Industries, correct?

25       A.   Correct.

Page 150

1      through these documents and refresh your

2      memory or just take a look at them to get an

3      understanding of what is here.

4          A.    Uh-huh.   (Witness reviews document).

5          Q.    What's your understanding as to what

6      Exhibit 6 is?

7          A.    I mean, it looks like just shipping

8      records, you know, of an invoice with

9      attached -- it has a load list, which I'm

10     assuming is the way they did their bill of

11     lading, and then our load list that's in

12     detail, the first part, and a bill of lading.

13         Q.    Now, the cover page has what's

14     referred to as a bill payment stub with a wire

15     transfer receipt.

16         A.    Uh-huh.

17         Q.    Is it your understanding or do you

18     know if it was FRI's regular business practice

19     to keep all of the documentation relating to a

20     specific order or a specific number of orders

21     all together by order number or by shipment

22     number?

23         A.    I think we would keep all the

24     documents, you know, what we received, all

25     together and, you know, as we paid them we

Page 151

1      would staple either a check stub or a payment

2      stub.

3          Q.   Okay.  Looking at this first bill

4      payment stub, there appear to be four

5      different shipments or orders referenced, the

6      first dating February 23rd and the last dating

7      March 1st, 2006, with separate balance amounts

8      and payment amounts.  Do you have an

9      understanding whether it would be FRI's

10     business practice then to keep all of the

11     records relating to those particular

12     referenced transactions together in one file?

13         A.   Yeah, they should all be put together.

14         Q.   So again, I would turn you to the

15     seventh page of the packet that is Exhibit 6.

16     It is another fax cover sheet dated February

17     27, 2006, from a Vanessa Sammons to Aimee at

18     Fiber Resources.

19         A.   Uh-huh.

20         Q.   Based upon either this fax cover sheet

21     or the other documents surrounding or

22     contained in Exhibit 6, do you have an

23     understanding from that who Kenco would be?

24         A.   I mean, Kenco was probably a warehouse

25     that Invista used.  Ask Invista, I'm sure they

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.              January 28, 2008

Page 205

1              marked for identification).

2    BY MR. LEE:

3        Q.   I'm showing you what's been marked as

4    Plaintiff's Exhibit 24, a similar document

5    that we've been looking at.  And, again, I'll

6    represent these documents came out of files

7    made available to us on Friday.

8        A.   Uh-huh.

9        Q.   Looking at the second page, again,

10   another invoice, it also shows the same merge

11   number, 89550.

12       A.   Uh-huh.

13       Q.   Does that lead you to believe that the

14   product being sold here is concrete fiber?

15       A.   Yes.

16       Q.   Looking at I guess the legend across

17   the top, Invista, Inc., with a Delaware

18   address, does this lead you to believe on this

19   date that this was after -- this date was

20   following the name change from DuPont to

21   Invista?

22       A.   I don't know.  They were -- they

23   worked as Invista for awhile before Koch

24   bought them, so you would know that date

25   better than me.

Page 208

1      A.   No.

2                (Plaintiff's Exhibit 26

3                marked for identification).

4    BY MR. LEE:

5      Q.   Who is Nancy Jimenez?

6      A.   I forgot about her.  She was a lady

7    that was an accountant for us for a few months

8    I guess in '04.  I had forgotten about her.

9    She was a great lady.

10     Q.   I'm showing you what's marked

11   Plaintiff's Exhibit 26, which, again, I'll

12   represent are documents obtained from Fiber

13   Resources' files on Friday.  It's a series of

14   invoice reference numbers from August of 2004.

15     A.   Uh-huh.

16     Q.   Looking to the first invoice, which I

17   guess is page 6, again, this product began as

18   merge number 89550 --

19     A.   Which page?

20     Q.   I'm sorry, it's page 6, which is the

21   first invoice.  Given the merge number 89550,

22   would that lead you to believe this invoice

23   was for the sale of concrete fiber?

24     A.   Yes.

25     Q.   And I guess with the legend across the

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Jack A. Hamilton, Jr.          January 28, 2008

Page 209

1     top changing Invista's address from Delaware

2     to Wichita, that would be after the

3     acquisition by Koch Industries, to your

4     knowledge?

5          A.   Yes, I would think so.  Yes.

6          Q.   Any reason to believe that FRI did not

7     receive these documents in its ordinary course

8     of business?

9          A.   No.

10                   (Plaintiff's Exhibits 27 and 28

11                   marked for identification).

12    BY MR. LEE:

13         Q.   Mr. Hamilton, I'm showing you what's

14    been marked as Plaintiff's Exhibit 27 first,

15    which is, again, a series of documents, and

16    it's got I guess the check stub number 13552

17    in the top right corner, again, in the same

18    document, okay.  And I'll represent these were

19    obtained from Fiber Resources' files on

20    Friday.

21         Turning to the first page -- or the second

22    page of the document, the first invoice,

23    again, merge number 89550, does that lead you

24    to believe that at least for that invoice

25    these documents represent the sale of concrete

# EXHIBIT B

Case 1:07-cv-00119-GMS    Document 38-2    Filed 02/01/2008    Page 19 of 46
Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Laurie A. Norris                January 29, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INVISTA S.à r.l. and INVISTA          )
(Canada) Company,                     )
                                      )
            Plaintiffs,               )
                                      )
        vs.                           )   CIVIL ACTION
                                      )    FILE NO.:
                                      )   07-119 (GMS)
FIBER RESOURCES INTERNATIONAL,        )
INC.,                                 )
                                      )
            Defendant.                )

                    - - -


     Deposition of LAURIE A. NORRIS,

taken on behalf of the Plaintiffs, pursuant to

the stipulations agreed to herein, before

Steve S. Huseby, Registered Professional

Reporter and Notary Public, at Decker,

Hallman, Barber & Briggs, 17th Floor, 260

Peachtree Street, Atlanta, Georgia, on the

29th day of January, 2008, commencing at the

hour of 9:04 a.m.

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Laurie A. Norris                January 29, 2008

Page 34

1        A.    I definitely worked with Missy McGee

2    and Betty Lloyd and someone named Frankie

3    Cheeks.

4        Q.    What was your understanding of their

5    roles with Invista?

6        A.    Betty and Frankie were in the

7    warehouse and Missy was in the credit

8    department.

9        Q.    So you deal with Missy for finance

10   issues and the other two for shipping issues?

11       A.    Right.

12       Q.    Now, I understood that Fiber Resources

13   purchased other product from Invista other

14   than concrete fiber from time to time?

15       A.    Right.

16       Q.    Was the ordering system or invoicing

17   system for those types of purchases different

18   than those for concrete fiber?

19       A.    No, it was pretty much the same.

20       Q.    Do you recall having a similar

21   constant demand for other types of products at

22   FRI other than concrete fiber?

23       A.    I know concrete was the main material

24   that we were in need of.

25       Q.    Have you heard of a company called

Page 35

1    Kenco, K E N C O, Group, Inc.?

2         A.    Sure.  It's a warehouse in Seaford,

3    Delaware.

4         Q.    By that, you mean like a bonded

5    warehouse?

6         A.    I believe so.  It's just one where

7    they stored goods, or perhaps it was a plant

8    where they produced goods.

9         Q.    Did you have dealings with Kenco?

10        A.    Yes, just to pick up material when it

11   was available.

12        Q.    Did Fiber Resources use Kenco to store

13   shipments or would that be a pickup point for

14   some shipments?

15        A.    Pickup point.

16        Q.    Do you recall a particular type of

17   product that was stored or came from Kenco?

18        A.    Gosh, I don't remember.

19        Q.    Do you know if it was used for

20   concrete fiber?

21        A.    I really, going back on my memory, I

22   don't know specifics.

23        Q.    I understand.

24        A.    The main location we pick up from was

25   the South Boston, Virginia.

Invista, et al. v. Fiber Resources International, Inc.   07-119 (GMS)
Laurie A. Norris                    January 29, 2008

1    Q.   And that was Clover Yarns?

2    A.   There were two others in Lugoff, South

3  Carolina, and if material were available, we

4  would pick up from those points as well.

5    Q.   And by pickup, you mean you would

6  arrange for a carrier or truck to in effect go

7  to the location and pick up material and

8  deliver it someplace for you?

9    A.   Yes.

10    Q.   Do you recall if Fiber Resources

11  selected Kenco as a warehouse slash shipper or

12  if it was simply notified by Invista that's

13  where the material would be?

14    A.   It was just notified by Invista.

15    Q.   Do you know how often FRI dealt with

16  Kenco or how often shipments were coming from

17  Kenco?

18    A.   Gosh, not on the level of Clover

19  Yarns.

20    Q.   Was it some sort of period, was it a

21  periodic basis, monthly, quarterly?

22    A.   Just maybe a couple times a month, if

23  that.

24    Q.   Do you recall a time period when you

25  all dealt with or were involved with Kenco?

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Laurie A. Norris                    January 29, 2008

Page 37

1      A.   Probably right in the thick of things,

2  like 2002 to 2004.

3      Q.   Do you recall dealing with Kenco in

4  2005/2006?

5      A.   I wasn't completely handling it then,

6  and I think there were -- if there were

7  pickups there, I don't recollect.

8      Q.   Was Amy primarily handling it then?

9      A.   I honestly don't know how much we were

10  dealing with Kenco at that point in time.

11      Q.   Okay.  Did you personally ever talk

12  with anyone with Kenco?

13      A.   Sure, if they called with, again, the

14  pickup number, the material, the pounds, I

15  would be notified via a telephone call.

16      Q.   Would they ever issue you paperwork

17  directly from Kenco?

18      A.   We would chase down the packing lists.

19      Q.   Ms. Norris, I want to show you what's

20  previously been marked as Exhibit 5, and also

21  Exhibit 6.  These were marked yesterday with

22  Mr. Hamilton.

23           MR. LEE:  I've got clean copies,

24  Winston.  Do you want another copy?

25           MR. BRIGGS:  That's all right.  I

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Laurie A. Norris                    January 29, 2008

Page 40

1    positive.  But she might not be in -- I know

2    that she was either transferred to another

3    department or, I don't even know, she might

4    have even left the company.

5        Q.    Turning to Exhibit 6, and Exhibit 6

6    I'll represent is a compilation of documents

7    that we obtained from Fiber Resources' files

8    this past Friday.  And when we spoke earlier,

9    a few minutes ago, we were talking about FRI's

10   practice of keeping all the documentation

11   related to a particular shipment together,

12   particular invoice together.  Is Exhibit 6

13   exemplary of that type of practice, if you

14   thumb through the document?

15       A.    (Witness reviews document).  Yes,

16   it's -- yes, I would say so.

17       Q.    Sort of thumbing through the front of

18   it from front to back quickly, I noticed the

19   cover page refers to bill payment

20   confirmation, is that correct?

21       A.    Yes.

22       Q.    And if you were handling the books at

23   the time, you would have been the person

24   processing these invoices and ensuring the

25   payments were made?

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Laurie A. Norris                    January 29, 2008

Page 41

1      A.    This was Patrice Dent's, but yes.

2      Q.    But during the time period you were

3  responsible, you would be doing the same?

4      A.    If I were handling the books.

5      Q.    Now, the second page, turning back, is

6  an invoice for one of the shipments

7  referenced, is that correct?

8      A.    Yes.

9      Q.    Now, looking at the third, fourth and

10  fifth pages, do these appear to be what we

11  described earlier as a packing list?

12      A.    Correct.

13      Q.    With the fourth and fifth pages

14  listing the pallets?

15      A.    Pallet numbers, yes.

16      Q.    Now, the sixth page would be a bill of

17  lading?

18      A.    Yes.

19      Q.    With the seventh page being, again,

20  another fax cover page from Kenco?

21      A.    Right.

22      Q.    So would it appear that then from

23  Kenco they would have faxed over this packing

24  list that precedes the cover sheet that we

25  just were talking about?

Page 42

1       A.    Yes.

2       Q.    Here, the fax cover sheet refers to

3    Vanessa Sammons as the export clerk for Kenco.

4    Did you ever speak to or deal directly with

5    Ms. Sammons?

6       A.    I might have spoken with her, I don't

7    recollect.

8       Q.    Now, I understand, of course, these

9    are various different documents related to a

10   different time in the process for a particular

11   shipment, but is it your understanding that

12   all of these documents had come in to Fiber

13   Resources during the regular course of its

14   business?

15      A.    I don't know what your question is.

16      Q.    Okay.  I know all the documents that

17   are compiled as Exhibit 6, it's a compilation

18   of different documents; is that fair?

19      A.    Yes.

20      Q.    And they were aggregated into one file

21   by Fiber Resources at some point in the filing

22   process, is that correct?

23      A.    When we made out a payment, it looks

24   like we paid four invoices.

25      Q.    And all of the documents that are

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Laurie A. Norris                    January 29, 2008

Page 43

1    compiled as part of this exhibit would have
2    come in at some point during Fiber Resources'
3    regular course of business?
4         A.   By come in, I don't know what you
5    mean.  Come in to --
6         Q.   Well, they would have been --
7         A.   Come in to the warehouse, come in to
8    the computer system.
9         Q.   They would have been delivered to
10   Fiber Resources at some point either by fax or
11   by mail?
12        A.   Oh, the paperwork, yes, right.
13        Q.   Correct.  That's what I'm referring
14   to, the paperwork would come in to Fiber
15   Resources.
16        A.   Okay.  I didn't know if you meant the
17   material.
18        Q.   No, I understand.  Thank you for
19   clarifying.  No, I don't mean the material --
20        A.   Yes, the paperwork would come in, yes.
21        Q.   Because the physical document itself
22   is a compilation of various paperwork.
23        A.   Correct.
24        Q.   And the paperwork would have been
25   generated at various different times in the

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
                    Laurie A. Norris          January 29, 2008

Page 44

1    process.

2          A.    Right.

3          Q.    But all of it would have been compiled

4    together as it had to come in through Fiber

5    Resources' regular course of business?

6          A.    Right.

7          Q.    Actually, turning back to Exhibit 6,

8    if you could.

9          A.    Uh-huh.

10         Q.    I don't know the page number, to be

11   honest, but it's going to be, if you find the

12   Kenco fax cover sheet and it's about three

13   pages back, appears to be a series of e-mails

14   where you are either the recipient or copied

15   on -- actually, it's the third page behind the

16   Kenco cover sheet.  So it's like the seventh

17   page in.  The page I'm referring to appears to

18   be a few different e-mails in the February

19   2006 timeframe.  Do you see that?

20         A.    Yes.

21         Q.    -- between, at the bottom, between a

22   Memo Rivera to a Tina Ingle, copied to you, a

23   then from the top from a Guillermo Rivera to

24   you; do you see that?

25         A.    Yes.

Page 56

1    back --
2        A.    Yes.
3        Q.    -- there's what's looks like a form,
4    it says standard conditions of sale, do you
5    see that?
6        A.    Yes.
7        Q.    Do you ever recall discussing any of
8    these conditions of sale with anybody at
9    Invista?
10       A.    No.
11       Q.    Now, this document follows the second
12   page, which appears to be -- the standard
13   conditions of sale follow what appears to be
14   the second page, which is labeled invoice; do
15   you see that?
16       A.    Yes.
17       Q.    Do you know if this document, if the
18   invoice would have come in in effect two-sided
19   with the invoice numbers on the front page and
20   the conditions of sale on the back?
21       A.    I believe this would have been an
22   invoice and this would have been the back side
23   (indicating).
24       Q.    So since it was an invoice, it would
25   have been the regular practice for that to be

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
Laurie A. Norris                    January 29, 2008

Page 57

```
 1    received by mail?
 2        A.    Right.
 3        Q.    Do you ever recall invoices being
 4    received by fax?
 5        A.    I'm sure we've had faxed invoices.
 6        Q.    Do you recall if you got faxed
 7    invoices more than mailed invoices or
 8    vice-versa?
 9        A.    Typically, probably more mail.
10        Q.    Do you ever recall getting invoices
11    sent by e-mail, by PDF?
12        A.    Not to my knowledge.
13        Q.    I understand that at some point either
14    DuPont early on or Invista implemented an SAP
15    system for its billing and ordering system, is
16    that correct?
17        A.    Yes.
18        Q.    As part of an SAP system, do you ever
19    recall getting automatically e-mailed
20    documentation from Invista?
21        A.    I automatically didn't get e-mailed a
22    lot.  As I said, I had to chase down
23    paperwork.  It was a ceaseless persistence.
24        Q.    Okay.  Looking I guess at the third
25    page for these standard conditions of sale
```

Invista, et al. v. Fiber Resources International, Inc.  07-119 (GMS)
                    Laurie A. Norris              January 29, 2008

Page 58

1    document again, have you seen this before?

2        A.   Again, I know that's on the back side

3    of an invoice.  I'm sure I've laid eyes on it

4    before.  I don't know that I've read it.

5        Q.   Did you have any reason to make use of

6    it as part of your dealings with Invista or

7    DuPont?

8        A.   No.

9        Q.   To your recollection, whenever FRI

10   received a mailed invoice, were those sort of

11   standard language terms and conditions on the

12   back?

13       A.   When -- I'm sorry?

14       Q.   FRI received an invoice in the mail,

15   to your recollection --

16       A.   From Invista?

17       Q.   From Invista, yes.  To your

18   recollection, do you recall seeing those

19   standard terms and conditions on the back?

20       A.   I'm sure that they were standard on

21   the back of the invoice, yes.

22       Q.   Do you ever recall when you would get

23   faxed invoices, whether you would see --

24   since, of course, the document comes through

25   fax one-sided as opposed to two-sided, would

# EXHIBIT C

# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

404-881-7000
Fax:404-881-7777
www.alston.com

Robert L. Lee                    Direct Dial: 404-881-7635                    E-mail: bob.lee@alston.com

November 21, 2007

*Via Facsimile and U.S. Mail*

Thomas C. Marconi
Losco & Marconi, P.A.
1813 N. Franklin Street
P.O. Box 1677
Wilmington, Delaware 19899

Re:    *INVISTA v. Fiber Resources*

Dear Tom:

We still have not yet received Fiber Resources' Initial Disclosures in this case. At your request, we previously extended the deadline for those disclosures until October 19, 2007. They are now two months overdue. I have previously contacted you to inquire as to the status of your client's production of its Initial Disclosures, but did not receive a response.

We will be required to move the Court to compel your client's production of its Initial Disclosures if we do not receive them by Wednesday, November 28, 2007.

Please do not hesitate to contact me with any questions.

Sincerely yours,

Robert L. Lee

RLL:ill
cc:    Jeff Moyer
       Kelly Farnan

LEGAL02/30611196v1

Atlanta • Charlotte • Dallas • New York • Research Triangle • Washington, D.C.

# EXHIBIT D

# RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

KELLY E. FARNAN

DIRECT DIAL NUMBER
302-651-7705
FARNAN@RLF.COM

January 16, 2008

**VIA HAND DELIVERY and E-MAIL**

David L. Finger, Esquire
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155

> Re:   **INVISTA S.a.r.l. and INVISTA (Canada) Company v. Fiber Resources International, Inc., D.Del., C.A. No. 07-119-GMS**

Dear David:

We have not yet received Fiber Resources' responses to INVISTA's First Set of Interrogatories and Requests for Production.  While Fiber Resources responses were due on January 3, 2008, we previously agreed to an extension until January 8, 2008 to respond to this outstanding discovery.  If we do not receive responses by noon this Friday, January 18, we will call the Court and request a discovery dispute teleconference pursuant to the Court's discovery dispute resolution procedures.

If you have any questions concerning the foregoing, please do not hesitate to contact me.

Very truly yours,

Kelly E. Farnan

Kelly E. Farnan

KEF/th
cc:   Robert L. Lee, Esq. (via e-mail)

RLF1-3244520-1

# EXHIBIT E

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                      -   -   -

4   INVISTA S.a.r.l. and INVISTA      :      Civil Action
    (Canada) Company,                 :
5                                      :
               Plaintiffs,            :
6                                      :
        v.                            :
7                                      :
    FIBER RESOURCES INTERNATIONAL,    :
8   INC.,                             :
                                       :
9              Defendant.             :      No. 07-119(GMS)

10                     -   -   -

11              Wilmington, Delaware
            Friday, September 28, 2007
12                 9:30 a.m.
              Telephone Conference
13
                       -   -   -
14

15  BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

16

17  APPEARANCES:

18          JEFFREY L. MOYER, ESQ.
            Richards, Layton & Finger
19
                        Counsel for Plaintiffs
20
            THOMAS C. MARCONI, ESQ.
21          Losco & Marconi, P.A.

22                      Counsel for Defendant

23

24

25

1          THE COURT:  Good morning.  Who is on the line

2     for the plaintiff?

3          MR. MOYER:  Your Honor, Jeff Moyer, Richards

4     Layton & Finger, on behalf of the plaintiffs.

5          THE COURT:  For Fiber Resources?

6          MR. MARCONI:  Thomas Marconi of Losco & Marconi

7     for the defendant.

8          THE COURT: All right.  Good morning.

9          A couple of things before we get into the

10    schedule.

11         Are we to anticipate the filing of motions in

12    this case from Fiber regarding jurisdiction and possibly

13    seeking a transfer of this matter?

14         MR. MARCONI:  We are, Your Honor, yes.

15         THE COURT:  Give me some sense of the

16    jurisdictional challenge and its basis.

17         MR. MARCONI:  The only basis, as far as I

18    understand, that there is jurisdiction here is -- I mean,

19    there is diversity someplace, perhaps there is diversity

20    someplace.  There would be diversity in this district.

21    There is enough at stake and the citizenship satisfies it.

22    The only real basis for jurisdiction, I think, is a

23    contractual one.

24         The plaintiff, I think, contends that we agreed

25    to jurisdiction and venue in Delaware by virtue of language

1   that we -- I think they were called order confirmation

2   forms.  But the defendants are telling me that those order

3   confirmation forms were never sent to them with the orders,

4   the orders came in through faxes, and that those forms were,

5   I think, snap-out carbon forms that had writing on the back,

6   and that most of the time the orders were placed and filled

7   orally, and they never received any of those confirmations.

8            THE COURT:  Sounds like a bar exam question.  Go

9   ahead.

10           MR. MARCONI:  So we don't think we are bound by

11  the contractual jurisdiction and venue argument, if you

12  will.

13           THE COURT:  Let's just talk about in personam

14  jurisdiction for a moment.  Leave venue aside for a moment.

15  Let me hear from plaintiff on this.

16           MR. MOYER:  Your Honor, we do have agreements

17  that are part of our order confirmation and our invoices for

18  each of the shipments at issue.  And each one has a

19  crystal-clear forum selection, exclusive forum selection

20  clause for the Courts of the State of Delaware, or if

21  jurisdiction is proper the Federal Court in the State of

22  Delaware.

23           We believe that each one of these forms was sent

24  along with each one of the order confirmations and that it's

25  a binding contract between the parties, and we had no choice

1    but to file suit in this jurisdiction, and that the

2    defendant, the language is the defendant unconditionally and

3    irrevocably consented to the personal jurisdiction of the

4    Courts in the State of Delaware, including the Federal

5    Court.

6            THE COURT:  During your meet-and-confer,

7    counsel, did you have a chance to discuss this?

8            MR. MOYER:  The jurisdictional issue?

9            THE COURT:  Yes.

10            MR. MOYER:  Your Honor, I actually have not

11    discussed the jurisdictional issue with Mr. Marconi.

12            MR. MARCONI:  Again, Your Honor, I would be

13    pleased to transfer the case down to the Northern District

14    of Georgia.

15            THE COURT:  Again, that is not what I want to

16    talk about right now.  Transfer is a different issue.  This

17    is the forum -- if we were just looking at Jumara factors --

18    that the plaintiff has selected.

19            So that selection, that choice, is going to be

20    given paramount consideration, apart from the assertion by

21    plaintiff as to the binding nature of the Court's

22    jurisdiction here, that is, the binding nature of the

23    contractual language.

24            MR. MARCONI:  The commercial issue aside, Your

25    Honor, as we say in the report, there is just no contact

1    with the State of Delaware at all.

2             THE COURT:  Well, that may be.  But if you have

3    contracted, if your client has contracted with the plaintiff

4    and in that contract agreed to jurisdiction here, what would

5    be the basis to contest that, that the Court has

6    jurisdiction?

7             MR. MARCONI:  Well, there would be less of a

8    basis for sure.  But, I mean, as I say, that is going to

9    have to be an issue that the Court is going to have to

10   decide.  We will do some discovery on it.

11            THE COURT:  That is fine.  You can do discovery

12   on it.  Whether the Court has to decide it or not is why I

13   am taking the time to discuss this with you.  In the

14   interests of judicial economy and saving this Court's

15   resources, it is incumbent upon counsel to have at least

16   some preliminary discussion to determine whether there is a

17   colorable basis for filing the motion challenging the

18   jurisdiction.  If there is not, I am going to take a very

19   dim view of that kind of filing.

20            I hope I am making myself clear.

21            MR. MARCONI:  You are, Your Honor.

22            THE COURT:  I expect there to be a conversation

23   and exchange of views and authorities on this subject before

24   any paper is filed on that.

25            I think once that is decided, then, depending

1    upon how it goes, it may take care of the transfer, any

2    notions of filing a transfer motion as well.  But I am going

3    to direct counsel to explore this in further discussions,

4    okay?

5                THE COURT:  Yes, Your Honor.

6                THE COURT:  I am going to pretty much adopt the

7    schedule, moving on to that, that you have jointly proposed.

8    I am assuming this is a joint proposal.  Is that correct?

9                MR. MOYER:  No, Your Honor.  That is the

10   plaintiffs' proposal.  Mr. Marconi did not join in that

11   proposal, but we wanted to have a schedule before the Court.

12               MR. MARCONI:  Your Honor, the only reason I

13   didn't at the time was that Fiber Resources is, for lack of

14   a better term, somewhat of a one-man show in terms of

15   authority.  And the person was in China, and I could not get

16   to him.  The only reason I didn't consent to it is because I

17   couldn't run it by the client.

18               But it's fine.

19               THE COURT:  Okay.  Let me go to the back end.

20   In terms of the type of trial, both parties are desirous of

21   a Bench trial in this case?

22               MR. MOYER:  Your Honor, in our contract, both

23   parties agree to waive a jury trial.

24               THE COURT:  What's Fiber Resources position on

25   that?

1          MR. MARCONI:  That is fine, Your Honor.  I don't

2     think it is a jury trial kind of thing.

3          THE COURT:  All right.  Then let's just on the

4     record go through the dates that are proposed for

5     accomplishing things, by, I will now say the parties.

6          So all discovery, as I understand it in

7     Paragraph 3 in the proposed scheduling order, including

8     merits and expert discovery, is proposed to be completed on

9     or before the  -- that is initiated in time to be completed

10    on or before the 18th day of January of 2008.  Is that

11    correct?

12         MR. MOYER:  That was the plaintiffs' proposal,

13    Your Honor.

14         MR. MARCONI:  I don't think there is going to be

15    a lot of discovery, frankly.

16         THE COURT:  I wouldn't imagine there would be.

17         There is some mention in this paragraph of

18    expert reports.  What kind of experts do the parties

19    anticipate needing in this kind of case?

20         MR. MOYER:  Your Honor, for the plaintiffs I am

21    not sure we will need any expert.

22         THE COURT:  From Fiber Resources' point of view?

23         MR. MARCONI:  I can't think of any now, Your

24    Honor.

25         THE COURT:  Then we will leave it at that.  All

1    discovery will be completed by January 18th.  You can

2    eliminate, then, the provision in the second sentence of

3    that paragraph for opening expert reports.  If you are not

4    going to need them, there doesn't need to be any language in

5    the scheduling order that's going to confuse the issue.

6                The laboring oar for preparing this scheduling

7    order will remain with the plaintiff.  Okay, counsel?

8                MR. MOYER:  Yes, Your Honor.

9                THE COURT:  I would like you to circulate it to

10   Fiber and get it filed by next Friday, October 5.

11               The schedule, the proposed scheduling order

12   contains current language as to the Court's discovery

13   dispute resolution process and other items.  So I am not

14   going to go through that again.  Both of you know how to

15   read.

16               Case-dispositive motions, the cutoff for filing

17   those, case- or issue-dispositive motions, will be February

18   8th, 2008, as proposed.

19               We are going to convene a pretrial conference

20   here in chambers, I have time that we can do this in June.

21   We can do the trial, actually, in July.  So I am going to

22   adopt the June submission date, June, close of business --

23   let me back up for a second.

24               I am not exactly going to adopt the language of

25   Paragraph 9.  Here is what you are going to do.  You are

1   going to submit the proposed pretrial order by the close of

2   business on June 2.  You can reconfigure this language to

3   reflect that.  June 30, 10:00 o'clock, will be the pretrial

4   conference.  We will set this matter down for trial

5   beginning July the 21st.

6                Do both parties believe that we are going to

7   need four days to try this case, as proposed?

8                MR. MOYER:  Your Honor, I am not entirely sure

9   what the defendant has in mind for their counterclaim.  But

10  I think we can get our case on and off in two days.  I don't

11  know how much time they would need.

12               THE COURT:  How about that?

13               MR. MARCONI:  Your Honor, I think four days is

14  probably safe.

15               THE COURT:  All right.  We will leave it at

16  four.  And both parties want this matter referred to one of

17  our Magistrate Judges.  Is that correct?

18               MR. MOYER:  For the plaintiff, yes, Your Honor.

19               MR. MARCONI:  Yes, Your Honor, for the

20  defendant.

21               THE COURT:  I think that that will be of

22  potentially great use and assistance to you.

23               You can keep that paragraph in there.

24               I think we have covered all of the relevant

25  dates, the significant dates.  Have you done initial

1    disclosures?

2              MR. MOYER:   No, Your Honor.   We had them set for

3    October 5th.

4              THE COURT:   That is fine.   Is that agreed to by

5    Fiber, agreeable to Fiber?

6              MR. MARCONI:   Yes, Your Honor.

7              THE COURT:   Counsel, anything else that we need

8    to talk about today?

9              MR. MOYER:   Not from the plaintiffs'

10   perspective, Your Honor.

11             MR. MARCONI:   Not the defendant's, Your Honor.

12             THE COURT:   Good luck.   And we will see you

13   along the way.

14             (Conference concluded at 9:45 a.m.)

15                  -  ~  -

16   Reporter:   Kevin Maurer

17

18

19

20

21

22

23

24

25