IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INVISTA S.à. r.l. and INVISTA (Canada) Company, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 07-119 (GMS) |
| FIBER RESOURCES INTERNATIONAL, INC., | ) ) ) ) | |
| Defendant. | ) | |

## [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter having come before the Court at a two-day trial on July ___, 2008, and the Court having considered the arguments of the parties and all admitted evidence, the Court makes the following findings of fact and conclusions of law.

## I.     Findings of Fact:

1.     INVISTA S.à.r.l. is a corporation organized and existing under the laws of the country of Luxembourg with its principal place of business at 4123 East 37th Street North, Wichita, Kansas 67220-3203.  INVISTA S.à.r.l. is in the business, amongst others, of selling off-quality fiber.

2.     INVISTA (Canada) Company is a Canadian company organized and existing under the laws of the Province of Ontario with its principal place of business at 7070 Mississauga Road, Missisauga, Ontario L5M 2H3.  INVISTA (Canada) Company is also in the business, amongst others, of selling off-quality fiber.

3.     Fiber Resources International, Inc. ("FRI") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business at 1100 Spring Street,

Suite 830, Atlanta, Georgia 30309. At the time of its business dealings with INVISTA, FRI was in the business of purchasing fiber and reselling it to customers.

    4.     INVISTA is one of the world's largest providers of integrated fibers and polymers. Amongst its other businesses, INVISTA sells off-quality fiber to customers for use in various products and for various applications. Beginning at least as early as 2001, INVISTA began selling off-quality fiber to FRI through a series of individual purchase agreements.

    5.     Generally, to initiate a purchase, FRI would contact INVISTA to inquire how much of a particular fiber was available for sale from INVISTA at any given time. INVISTA would respond to FRI with the amount of the desired fiber that was available. In some instances, FRI would thereafter submit Purchase Orders to INVISTA identifying the type and volume of particular fiber it desired to purchase.

    6.     In response to FRI's requests, or at times purchase orders, INVISTA would in some instances issue Order Acknowledgements to FRI specifying the fiber type, quantity, sales price, and shipping information for the particular order. At times, depending on the volume specified by FRI, INVISTA would issue multiple Order Acknowledgements to fill a particular Purchase Order. In other instances, INVISTA simply shipped product to FRI without sending Order Acknowledgements.

    7.     Upon shipment of fiber to FRI, INVISTA would issue an Invoice to FRI for the amount due from FRI for that shipment. At times, INVISTA would provide FRI with an invoice after the fiber identified in the invoice had been shipped.

    8.     From April through June 2006, FRI purchased fiber in the amount of $589,471.26 from INVISTA in a series of transactions.

9.     The transactions were memorialized in a series of written Order Acknowledgements and Invoices, which contained the Terms and Conditions governing the transactions.

10.    FRI accepted the fiber shipped by INVISTA in connection with each purchase transaction.

11.    FRI did not pay INVISTA for the fiber that it shipped to FRI from April through June 2006.

**II.    Conclusions of Law:**

**A.    Plaintiffs' Claims:**

12.    INVISTA and FRI entered into individual agreements whereby FRI purchased fiber from INVISTA.    The Order Acknowledgements and Invoices entered into evidence demonstrate and constitute the agreements between FRI and INVISTA.

13.    The agreements provide that any dispute "arising out of or relating to" those agreements will be governed by New York law.    Such broad choice of law provisions have been found to encompass related tort and fraud claims. *See Gloucester Holding Corp. v. U.S. Tape and Sticky Products, LLC*, 832 A.2d 116, 124 (Del. Ch. 2003) (citations omitted).    Accordingly, both INVISTA's claims and FRI's counterclaims in this action are governed by New York law.

14.    INVISTA performed under the individual agreements by shipping to FRI the fiber identified in the agreements, as admitted by FRI.

15.    FRI admitted that it failed to pay for the fiber it accepted as identified in the agreements.

16.    FRI did not return the fiber to INVISTA, and instead sold it to its own customers for a profit.

RLF1-3290994-1

17.    INVISTA has been damaged in the amount of at least $589,471.26 plus interest for FRI's breach of the agreements.

18.    The agreements that govern FRI's purchases of fiber from INVISTA provide that "payment shall be received by INVISTA no later than thirty (30) days from the date of INVISTA's invoice. Delay in payment will result in Buyer being responsible for interest at a rate of one and a half percent (1½%) per month compounded monthly (19.6% per annum) . . . .". *See* ¶ 10, Exhibit ____. FRI did not pay for the fiber that it purchased from INVISTA within 30 days of the date of INVISTA's invoices.

19.    The agreements that governed FRI's purchases of fiber from INVISTA also provide that INVISTA is entitled to collect costs, attorneys' fees, and expenses in connection with any action brought as a result FRI's defaults under the agreement. *See* Exhibit ____.

20.    As a result, INVISTA is entitled to pre-judgment and post-judgment interest at the rate specified by the parties in the agreements, as well as the recovery of its attorneys' fees, costs and expenses incurred for bringing this action.

**B.    Defendant's Claims:**

21.    FRI claims its failure to pay INVISTA for the fiber it received is excused by INVISTA's breach of an exclusive dealings agreement.

22.    FRI is not excused from failing to pay INVISTA for the fiber ordered and received by FRI.

23.    FRI has failed to prove that the parties reached an oral agreement as alleged by FRI. FRI has failed to produce sufficient evidence to demonstrate that the parties agreed to any terms by which either party would be bound, including duration, quantity or price.

4

24.    Therefore, the evidence does not show that FRI and INVISTA entered into an agreement whereby FRI would have the exclusive right to sell off-quality fiber for concrete applications provided by INVISTA.

25.    To the extent the parties contemplated reaching an agreement, FRI has failed to establish any necessary material terms of such an agreement, such as the parties' respective duties and obligations pursuant to any agreement and the parties' consideration for such an agreement.

26.    Further, any agreement the parties may have reached is void as a matter of law.

27.    Under New York's Uniform Commercial Code, parties may enter into an exclusive agreement for the sale of goods, provided that the agreement is lawful. N.Y. UCC § 2-306.  The U.C.C. (and common law) statute of frauds provide that contracts for the sale of goods for the price of $500.00 or more must be contained in a writing signed by the party against whom enforcement is sought, and must specify a quantity.  N.Y. UCC § 2-201.  A contract that does not satisfy the requirements of this section, but is otherwise valid, is enforceable if: (a) the goods are specially manufactured for the buyer and are not suitable to others in the ordinary course of the seller's business and the seller has made a substantial beginning in their manufacture or commitments for their procurement; (b) the party against whom enforcement is sought admits in a pleading or in testimony that a contract for the sale of goods was made; or (c) "[w]ith respect to goods for which payment has been made and accepted or which have been and accepted."  *Id.*

28.    Generally, an alleged oral exclusive dealings agreement is unenforceable under the statute of frauds as an agreement that may not be performed within a year of its making because there is no provision in the agreement for its termination.  *See Koeniges v. Woodward,* 707 N.Y.S.2d 781, 785-86 (N.Y. Civ. Ct. 2000); *Zimmer-Masiello, Inc. v. Zimmer, Inc.,* 159

A.D.2d 363, 367-68 (N.Y. App. Div. 1990) (alleged oral "exclusive" distribution agreement unenforceable where the plaintiff alleged the agreement was for an indefinite term); *United Magazine Co. v. Murdoch Magazines Dist., Inc.*, 146 F. Supp.2d 385, 403-04 (S.D.N.Y. 2001) (alleged exclusive distribution agreement unenforceable where the agreement did not have an express termination provision).  A contract for an indefinite term is capable of performance within a year only if there is an express provision for the termination prior to the end of the year. *United Magazine*, 146 F.Supp.2d at 403-04. ("The New York cases uniformly hold that implied termination terms are not sufficient to take an oral contract out of the statute [of frauds]." (citing *Burke v. Benova*, 866 F.2d 532, 538 (2d Cir. 1989)).

29.     To the extent INVISTA and FRI entered into an exclusive dealings agreement for the sale of certain fiber, such an agreement is void as a matter of law.  The agreement could not be performed within a year of its making because there was no provision in the agreement for its termination.  Similarly, the agreement did not contain any provisions regarding a quantity, and is therefore void.   N.Y. UCC § 2-201; *see e.g. International Commercial Resources, Ltd. v. Jamaica Public Services Co.*, Ltd., 612 F.Supp. 1153, 1155 (S.D.N.Y. 1985).

30.     Accordingly, INVISTA has not breached any exclusive dealings contract with FRI.

31.     In order to prevail on its claim for tortious interference with contractual relations, a plaintiff must show the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages. *White Plains Coat and Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007).  In response to such a claim, a defendant may raise the economic interest defense - that it acted to protect its own legal or financial stake in the breaching party's business.  *Id.*  Further, liability is limited to

RLF1-3290994-1

improper inducement of a third party to breach its contract, and does not negate a competitor's right to solicit business. *Id.* Sending regular advertising and soliciting business in the normal course does not constitute inducement of breach of contract. *Id.*

32.    In order to recover for tortious interference with prospective business relations, a plaintiff must allege that the defendant: (1) interfered with those prospective relations, (2) either (a) with the sole purpose of harming plaintiff, or (b) by means that were dishonest, unfair or improper. *Advanced Marine Tech., Inc. v. Burnham Securities, Inc.,* 16 F.Supp.2d 375, 385 (S.D.N.Y.1998). Further, a plaintiff must demonstrate that the defendant "intentionally caused the [third party] not to enter into a contractual relationship with" the plaintiff. *Id.* at 386.

33.    FRI has not demonstrated that it had valid, enforceable contracts with any third party, or that it had legitimate prospective relations with any third party. Further, FRI has not demonstrated that INVISTA intentionally interfered with any contracts or relationships with any third parties, or that INVISTA otherwise engaged in acts of dishonesty or acted unfairly or improperly.

34.    Finally, given that FRI did not have an exclusive dealings arrangement with INVISTA, FRI could not reasonably expect that it had any protectible interest in any relationships with its customers or prospective customers.

35.    Accordingly, INVISTA did not tortiously interfere with FRI's contractual or business relations with its customers.

36.    To recover damages for lost profits, a party must show that: (1) the damages were caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty; and (3) the particular damages were within the contemplation of the parties to the contract at the time it was made. *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1011 (N.Y. 1993). Damages

7

resulting from the loss of future profits must only be "capable of measurement based upon known reliable factors without undue speculation. *Id.*; *Mehta v. New York City Dep't of Consumer Affairs*, 556 N.Y.S.2d 601, 602 (N.Y. App. Div. 1990) ("In order to recover lost profits, a business must have been established and in operation for a definite period of time."). In determining whether the damages were in the contemplation of the parties at the time of contracting, it is only necessary that a loss resulting from a breach be foreseeable and probable, not that the breach itself be foreseeable. *Ashland*, 624 N.E.2d at 1010.

37.     FRI has not offered sufficient evidence to support its claim for lost profits. It has not offered evidence in order that those profits may be proven with reasonable certainty, or that its particular damages were within the contemplation of the parties at the time the contract was made.

<table>
<tr><td></td><td>_____/s/Jeffrey L. Moyer_____</td></tr>
<tr><td></td><td>Jeffrey L. Moyer (#3309)</td></tr>
<tr><td></td><td>moyer@rlf.com</td></tr>
<tr><td>OF COUNSEL:</td><td>Kelly E. Farnan (#4395)</td></tr>
<tr><td></td><td>farnan@rlf.com</td></tr>
<tr><td>Robert L. Lee</td><td>Richards, Layton & Finger</td></tr>
<tr><td>Rebecca B. Crawford</td><td>One Rodney Square, P.O. Box 551</td></tr>
<tr><td>Alston & Bird LLP</td><td>Wilmington, DE 19899</td></tr>
<tr><td>1201 West Peachtree Street</td><td>*Attorneys for Plaintiffs INVISTA S.à.r.l. and*</td></tr>
<tr><td>Atlanta, Georgia 30309-3424</td><td>*INVISTA (Canada) Company*</td></tr>
<tr><td>(404) 881-7000</td><td></td></tr>
</table>

Dated: June 9, 2008